IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAURICE D. JORDAN,<br><br>　　　　　　　Petitioner,<br><br>vs.<br><br>WILLIAM MUNIZ, Acting Warden,<br>Salinas Valley State Prison,[1]<br><br>　　　　　　　Respondent. | No. 2:12-cv-03049-JKS<br><br>MEMORANDUM DECISION |

Maurice D. Jordan, a state prisoner proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Jordan is currently in the custody

of the California Department of Corrections and Rehabilitation and is incarcerated at Salinas

Valley State Prison.  Respondent has answered, and Jordan has replied.

### I. BACKGROUND/PRIOR PROCEEDINGS

The California Court of Appeal set forth the factual and procedural background of this

case as follows:

> **I. FACTS**
>
> On November 4, 2007, [Jordan] lived with his girlfriend Christina Skaggs and her
> four-year-old son at 230 Shasta Street, unit B, in Vallejo.  That day, Roderick Anderson
> was fatally shot outside the Shasta Street apartment building.  The weapon was an assault
> rifle.  Two versions of the shooting emerged from the investigation and trial.  Skaggs,
> [Jordan's] brother Marco Glaude, and Glaude's girlfriend Brittany Wright told the police
> that Anderson attacked [Jordan], who called to Glaude to "get the K."  Glaude retrieved
> an assault rifle from [Jordan's] apartment, returned to the scene and shot Anderson upon
> [Jordan's] direction to "[f]inish him."  Other eyewitnesses reported that [Jordan] went
> into the apartment, came back with the rifle and shot Anderson.

---

[1]　　　William Muniz, Acting Warden, Salinas Valley State Prison, is substituted for
R.T.C. Grounds, former Warden, Salinas Valley State Prison.  FED. R. CIV. P. 25(d).

## A. *Events Preceding the Shooting*

[Jordan] and Skaggs lived next door to Lethia Edwards and her daughters, S1 and S2. Edwards knew [Jordan] by the nickname, "Pieces." The day before the shooting, Edwards saw [Jordan] with a small box. Responding to her query if he had a mousetrap, [Jordan] said, "No, these are some bullets," which he showed to Edwards. [Jordan] said he was going to "shoot one of theses niggas around here" because he was tired of people "mean mugging" him.[2] Edwards explained that "mean mugging" means giving someone a bad look. [Jordan] was "cool" with Edwards and her son Lakheem, but he was not okay with some others.

> FN 2. Skaggs is Caucasian and had long black hair; [Jordan], his brother Glaude and Wright are African-American.

November 4, 2007, was Glaude's 18th birthday. That afternoon [Jordan], Skaggs, Glaude and Wright went to see the movie "American Gangster," returning to [Jordan's] apartment after the movie. [Jordan] showed Glaude a rifle he got from a cousin, and showed him how to take the safety off and use it. Thereafter [Jordan] left with Skaggs (a prostitute), who was going on a "date." They were gone for about an hour and a half. After they returned, Skaggs left again to get food for everyone. Returning, she parked in the driveway next to a green car. Three young African-American men, including Roderick Anderson, were inside the garage, in front of the green car. As she walked by them, one made a comment of a sexual nature in relation to her high heels clicking. Back in the apartment, Skaggs told [Jordan] about the comment, but said not to worry, it was nothing.

[Jordan] went outside; he left his handgun inside on the floor. Skaggs noticed [Jordan] was not standing on the porch. She and Wright heard someone yell, "white bitch."

## B. *The Shooting According to Skaggs, Wright and Glaude*

Skaggs ran outside. She saw the three men jumping [Jordan]. One had [Jordan's] chain and was punching him in the face, while another was on the side punching him. Skaggs acknowledged that she did not see the beginning of the altercation and thus did not know whether [Jordan] first jumped one of the men.

Skaggs yelled for Glaude to help. [Jordan] yelled "Get the kator." One of the men said, "Oh, you're going to get a gun" and ran inside with one of the other men. [Jordan] and the remaining man were "rustling back with each other, having a hold of each other," grabbing and punching.

Glaude pulled the rifle from under the couch and ran outside toward Skaggs. Skaggs said, "Don't do this." Glaude shoved her away. He said, "Get off my brother" then fired the rifle toward the garage where [Jordan] and Anderson were still grappling. Skaggs ran into her apartment. Once inside, she looked out the door and saw [Jordan] and Anderson on the ground. [Jordan] was holding the AK-47 and Glaude was standing directly in front of him. Anderson was lying on his side with his arms wrapped around

[Jordan's] waist.  He looked disabled because he was not moving; he did not appear to be holding on very well.

Glaude ran up to [Jordan]; [Jordan] tossed the weapon to him and said, "Kill him."  [Jordan] rolled out of the way; there was blood on the back of his shirt.  Glaude shot Anderson three times in short succession, killing him.

Skaggs ran into her bedroom.  On the way she saw Glaude standing over Anderson; [Jordan] was four or five feet away.  Glaude ran into the living room with the AK-47, grabbed Skaggs's computer and yelled for her to "get the keys, let's go."  Wright left with Glaude, and Skaggs decided to leave, too.  She tried to catch her puppy, but Wright was yelling "the cops are coming" so Skaggs ran to the car.  They all got in the car: Skaggs in the driver's seat, [Jordan] in the front passenger seat, and Wright and Glaude in the back seat.  As they were getting into the car, Skaggs saw one of the men shooting at them from outside apartment A.  Wright heard gunshots behind them as they started to head around the corner.

A white car chased them and pulled alongside as they approached the freeway onramp.  She sped up and ran a red light.  Skaggs saw a gun pointed at her from someone in the white car.  [Jordan] told Glaude to give him the rifle; he hung out the window and fired it at the white car, which skirted away.

Glaude exercised his Fifth Amendment rights and the trial court found him unavailable as a witness.  The parties stipulated that the videotape of his pretrial statement to police investigators would be admitted.

## C. *The Shooting According to Other Eyewitnesses*

Michael Woody, along with his sister Nahdiah Woody and her boyfriend Akiyah Jenkins, witnessed the shooting of Anderson.  They were "chilling" outside while visiting Woody's uncle at Shasta and Florida Streets.  Michael Woody saw about six other people "chilling" outside the duplex across the alley.  Then he noticed that two African-American males were tussling, grabbing onto each other; one had been playing earlier with a dog.  The other people had gone back inside.  Two people came out and started yelling; everyone else came outside after that.  A male came outside with what appeared to be a black machine gun with a clip.  Michael Woody heard gunshots but did not hear anyone yelling,[3] nor did he see the man fire the gun.  As Woody ran off, he heard more shots.  Woody could not identify [Jordan] during the investigation or at trial.

> FN 3.  When interviewed a couple days later by police investigators, Woody said that while the two men were tussling, he heard what he thought was an African-American woman call out to "get the thing."  However, he explained at trial that this is what his sister had told him.  Officer Meredith testified that Woody told him a "non-black" woman came out of the house with the suspect.

Nahdiah Woody also saw two young African-American men fighting.  One man got knocked over; the other went into the house and came back with a gun with a banana clip.  A [w]hite woman was standing by him.  She said, "Stop, it's not worth it."  Nonetheless, standing at the bottom of the stairs, the man fired one shot directly at the

man who was "getting up off the ground."  He fell to the ground and everyone started running.  The man with the gun walked over to the person who had been shot; Nahdiah heard two more shots.  She ran into her uncle's house and heard more gunfire a few minutes later, but the shots were not as loud as the previous shots.

Akiyah Jenkins witnessed two African-American men arguing in front of a garage.  Two African-American women were there.  One said, "[D]on't do that, don't fight. . . . "  The other said, "Go get the gun."  One of the men ran into the duplex and came back with a "chopper" with a banana clip that looked like an AK-47.  A skinny young African-American woman hopped in front of him and tried to tell him to stop, but the man moved her away and then fired a shot, "like a pro."  As Jenkins ran away, he looked back and saw the person with the gun standing over the victim; the man fired two more shots "[e]xecution style."  He never saw the assailant's face.

Michael Ware and sisters S1 and S2 were returning to Edwards's apartment on 230 Shasta Street when Ware and S2 heard gunshots.  Ware saw his friend Roderick Anderson lying on the ground but did not see anyone with a gun.  Ware also saw [Jordan] and "the Mexican girl" run into a car, with the "guy" Ware had talked with earlier, and Brittany Wright.  As they pulled up to the house, S2[4] observed "Pieces" running to Skaggs's car with a big gun in his hands.

> FN 4.  S2 admitted in juvenile court that she committed a felony robbery and residential burglary.

Ware followed the car, running a stoplight when the driver of the other car ran the light.  Ware was trying to hit the car to stop it and get a license plate number.  Someone from the other car began shooting at Ware's car.  S1 and S2 saw [Jordan] lean out the window of the car and shoot at them.  S1 thought she was shot so they pulled over.  Ware, S1 and S2 denied that anyone in Ware's car had a gun.  Ware returned to Edwards's apartment and police tried unsuccessfully to resuscitate Anderson.  There were no weapons near him.

## D. *Subsequent Events*

[Jordan] spoke to the landlord after the shooting and told her he would "light that block up again" if he did not get his property back from the apartment.

The four drove to the home of [Jordan's] aunt, in Antioch.  There, [Jordan] told his aunt that Glaude had killed someone.  There was blood on [Jordan's] clothes; he and Glaude burned their clothes in the fireplace.  [Jordan] asked his aunt for money.  [Jordan] suggested blowing up the car and later stated he cleaned it with bleach.  Skaggs begged [Jordan] to "let me go" but he would not allow this, indicating that if Skaggs said anything, she would end up dead in a ditch.  Wright also asked to leave but was not permitted to do so.

The next day another aunt drove them to a motel in Fremont.  [Jordan] told her that they killed someone.

On November 6, 2007, the four took a bus to Anaheim.  [Jordan] beat Skaggs when she asked to leave.  While in Anaheim, Skaggs and Wright went on "dates" to get money.

Skaggs recalled that [Jordan] regretted telling his brother to shoot Anderson.  The brothers discussed whose fault it was.  When [Jordan] learned the police were looking for them, he said he was going to take the rap because he should not have told his little brother to do it.

They were arrested in Anaheim on November 13, 2007.  The arresting officer initially did not mention the Vallejo case; nonetheless, [Jordan] asked if he would be transported to Vallejo.  He also asked to say goodbye to his girlfriend because he would not be seeing her again.  He told another officer he was going away for a long time, and would never get out.  Putting his head on the curb, he said, "Oh, man, I made a mistake."

Vallejo police interviewed Glaude.  Glaude acknowledged that right before the final shooting, [Jordan] said to "[f]inish him" or "[e]nd him."  Glaude cried during the interview and said he knew he was going to prison for the rest of his life.

## E. *Investigation and Aftermath*

The getaway car was found in the driveway of the home of [Jordan's] aunt in Antioch, and a large assault rifle with a detached magazine containing 16 bullets in a garbage bag was recovered from nearby bushes.  [Jordan's] rifle fired 7.62-caliber bullets.  The bullet fragments found in the victim during the autopsy were consistent with being fired from this rifle.  Anderson died from multiple gunshot wounds.

Police found four 7.62-caliber casings in the vicinity of the scene.  Anderson's DNA profile matched the genetic profile of bloodstains from the front and exterior rear door of the getaway car.  The DNA profile detected from the swab of the magazine of [Jordan's] rifle showed a mixture of DNA, one contributor being Anderson.

Prior to the preliminary hearing, Akiyah Jenkins received a letter with [Jordan's] return address that asked, "What do you feed rats?"  Jenkins took this as a threat to his life.  He shared the letter with his sister Nahdiah.  She took the following additional phrases in the letter as threatening: "[T]here are still a lot of people, family, folks, patnas, and real niggaz that love me out there," and "You still got cha work on that good list?  Let's keep it solid out there."  S1 received a letter from [Jordan] as well, wherein he listed addresses and phone numbers of various people, said to "stay safe out there on them mean streets," and also wrote, "God gave you mouth and ears, so talk less and listen more."  S1 interpreted this as a threat.  She also felt threatened by his statement that "I just was waiting to . . . let you know and your whole household: Lethia, [S2], . . . —whoever that dude is, that I'm always thinking about them—not only me but a couple of my folks, you know, the ones love me very much and would love to see me free.  I'm so blessed to have real friends and family that is willing to go the extra mile to make me happy."  And finally, this, too, was threatening to her: "Live happy and peaceful and always watch out for each other because there's no telling who is watching you."

*Defense:* [Jordan] did not testify at trial.  Defense counsel highlighted the following during closing argument to argue that [Jordan] was a reasonable person under attack:

> [Jordan] had been choked to the point he was still bleeding when they arrived in Antioch. Initially he had been attacked by three people and violently robbed of his necklace. When Glaude shot Anderson, [Jordan] was "completely immobilized, unable to defend himself, while he is being choked and punched at the same time." That is the situation when [Jordan] yelled to "Go get the K." That Anderson's DNA was on the rifle magazine was circumstantial evidence that he was still struggling with [Jordan] before [Jordan] was able to get away from Anderson and say, "Kill him."

*People v. Jordan*, No. A126859, 2011 WL 1878809, at *1-5 (Cal. Ct. App. May 17, 2011).

A jury convicted Jordan of second degree murder and possession of a firearm by a felon. *Id.* at *1. The jury acquitted Jordan of three counts of attempted murder, three counts of assault with a firearm, and shooting at an occupied motor vehicle. *Id.* In a separate bench trial, the court found true the allegations that Jordan suffered one prior serious felony conviction and three prior prison terms. *Id.* Thereafter, the court sentenced Jordan to a determinate term of six years in state prison and a consecutive indeterminate term of thirty years to life plus five years for the prior serious felony. *Id.*

Jordan appealed through counsel, arguing that: 1) the trial court improperly instructed the jury that under the theory of aiding and abetting, each principal may be "equally guilty"; and 2) the admission of Glaude's statement to police violated his right to confrontation and trial counsel was ineffective for failing to object to the admission of that statement. The Court of Appeal affirmed Jordan's judgment of conviction in a reasoned, unpublished opinion on May 17, 2011. *Id.* at *11. The court found that there was no prejudicial instructional error and that Jordan's trial counsel made a tactical decision to place Glaude's statement to the police before the jury. *Id.* at *6-10.

Jordan filed a counseled petition for review with the California Supreme Court, raising the same claims he unsuccessfully raised before the Court of Appeal.  The supreme court summarily denied review on July 20, 2011.

Jordan then filed a *pro se* petition for writ of habeas corpus with the superior court, arguing that based on newly discovered evidence, the trial court improperly allowed Dr. Gill to testify about the autopsy performed on Anderson because Dr. Gill had a history of incompetence and negligence, and Dr. Gill perjured himself at trial and the prosecutor committed misconduct in allowing him to testify falsely.

The superior court denied Jordan habeas relief on May 4, 2012.  The court concluded that Jordan failed to state a prima facie case with respect to his newly discovered evidence claim and prosecutorial misconduct claim.  Jordan apparently filed a petition for writ of habeas corpus with the Court of Appeal, although that petition is not part of the record before this Court, and the Court of Appeal denied relief on June 7, 2012.  Jordan then filed a petition for writ of habeas corpus with the California Supreme Court, raising the same claims he unsuccessfully raised in his petition to the superior court.  On October 10, 2012, the California Supreme Court summarily denied relief.

On March 14, 2012, Jordan filed a second *pro se* petition for writ of habeas corpus with the superior court, alleging that the trial court improperly denied his motion in limine to exclude Dr. Gill despite Dr. Gill's disrepute.  Jordan further alleged that the victim's family and friends intimidated the jury thereby violating his right to a fair trial.  Jordan additionally argued that his trial counsel performed deficiently in failing to hire an expert pathologist to combat Dr. Gill's report and testimony.

On May 10, 2012, the superior court denied Jordan habeas relief.  Citing *In re Harris*, 855 P.2d 391, 398 (Cal. 1993), and *In re Dixon*, 264 P.2d 513, 514 (Cal. 1953), the superior court concluded that, other than Jordan's ineffective assistance of counsel claim, his claims involved matters that were based on the record and should have been raised on direct appeal. Citing *People v. Duvall*, 886 P.2d 1252, 1258 (Cal. 1995), the court further concluded that Jordan failed to state a prima face case for the ineffective assistance of counsel claim because he failed to support his claim with facts or reasonably available documentary evidence to overcome the strong presumption that counsel acted reasonably and that the challenged actions constituted sound trial strategy.  On June 4, 2012, Jordan filed a petition for writ of habeas corpus with the Court of Appeal, although the petition is not part of the record before this Court.  On June 7, 2012, the Court of Appeal summarily denied Jordan habeas relief.  On June 27, 2012, Jordan filed a petition for habeas relief with the California Supreme Court, again arguing that the trial court improperly allowed Dr. Gill to testify as an expert witness, his trial counsel was ineffective for failing to obtain an expert pathologist to counter Dr. Gill's testimony, and that the jury "was tampered and tainted with" when friends and family of the victim allegedly threatened jurors as they walked to their cars.  On October 10, 2012, the California Supreme Court summarily denied Jordan relief, citing *Duvall*, 886 P.2d at 1258, and *In re Swain*, 209 P.2d 793, 796 (Cal. 1949).

After twice filing a Petition of Writ of Habeas Corpus with the wrong federal court, Jordan filed his Amended Petition with this Court on June 20, 2013.  Respondent does not argue that the Amended Petition is untimely or that Jordan failed to exhaust his claims in state court.

## II. GROUNDS/CLAIMS

In his *pro se* Amended Petition before this Court, Jordan argues that: 1) the trial court misstated California law in charging the jury that each principal, regardless of the extent of his participation, is "equally guilty," and trial counsel was ineffective for failing to object to the instruction; 2) the admission of Glaude's statement to police violated Jordan's right to confrontation and the failure of trial counsel to object to the admission of that unredacted statement amounted to ineffective assistance; 3) the trial court erroneously permitted Dr. Gill to testify as an expert despite his disrepute; 4) trial counsel was ineffective for failing to call an expert pathologist to counter Dr. Gill's testimony; 5) the jury could not remain impartial after being threatened by members of the audience; 6) newly discovered evidence demonstrates that Dr. Gill committed perjury; and 7) the prosecutor committed misconduct in allowing Dr. Gill to testify falsely.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)

"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision." *Id.* at 412.  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"

*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

In applying these standards on habeas review, this Court reviews the "last reasoned

decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004)

(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Under the AEDPA, the state court's

findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear

and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340

(2003).

## IV. DISCUSSION

1.    *Strickland Standard on Habeas Review*

Jordan raises both freestanding ineffective assistance of counsel claims as well as

ineffective assistance of counsel claims that are intertwined with other substantive claims.

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant

must show both that his counsel's performance was deficient and that the deficient performance

prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which

"counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by

the Sixth Amendment." *Id.* The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Thus, Jordan must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart*, 474 U.S. 52, 57 (1985).

An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

It is through this highly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d) standard. *See Knowles*, 556 U.S. at 123 (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

2.      Merits

Instructional error

Jordan first argues that the trial court misstated California law in charging the jury that

under the theory of aiding and abetting, each principal, regardless of the extent of his or her

participation, is "equally guilty."  Jordan raised this claim on direct appeal, and the Court of

Appeal described the factual background of this claim as follows:

> In closing argument the prosecutor acknowledged that "there's a lot of conflicting
> evidence. . . .  [¶] . . . [¶] . . . [Y]ou had two sets of people believing two different things
> here.  Mr. Ware[, S1 and S2], they believe he shot and killed their friend. . . . [¶] . . . [¶]
> . . . [T]he Woodys and Mr. Jenkins, they saw a fight between two guys.  What they
> thought they saw was one of the guys go get a gun out and shoot the other guy. . . . [¶]
> Then you have the people, Ms. Scaggs [sic], Ms. Wright, and [Glaude], who were with
> [Jordan] virtually the whole time, and you have their statements, which are that he called
> for the gun; that [Glaude] shot the victim; he got the gun from [Glaude], gave it back to
> him, and ordered [Glaude] to kill the victim."  The prosecutor argued that the best
> evidence proven beyond a reasonable doubt corresponds to what the latter three said,
> "which would make [Jordan] an aider and abettor to this crime."
>
> The trial court instructed the jury on first and second degree murder and voluntary
> manslaughter/imperfect self-defense or imperfect defense of another, and that a person
> may be guilty of a crime by directly committing it, or as one who aided and abetted the
> perpetrator.
>
> Specifically, the court instructed in language patterned after CALCRIM Nos. 400
> and 401, as follows: "A person may be guilty of a crime in two ways:  He or she may
> have directly committed the crime.  I will call that person 'the perpetrator.'  Two, he or
> she may have aided or abetted a perpetrator who directly committed the crime.  A person
> is equally guilty of the crime whether he or she committed it personally or aided and
> abetted the perpetrator who committed it. . . . [U]nder some specific circumstances, if the
> evidence establishes aiding and abetting of one crime, a person may also be found guilty
> of other crimes that occurred during the commission of the first crime.  [¶]  To prove that
> the defendant is guilty of a crime based upon aiding or abetting that crime, the People
> must prove that: One, the perpetrator committed the crime; two, the defendant knew that
> the perpetrator intended to commit the crime; three, before or during the commission of
> the crime, the defendant intended to aid and abet the perpetrator in committing the crime;
> and three [sic], the defendant's words or conduct did, in fact, aid and abet the
> perpetrator's commission of the crime.  [¶]  Someone aids and abets a crime if he or she
> knows of the perpetrator's unlawful purpose and he or she specifically intends to and
> does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission
> of that crime."

   And finally, the court also instructed the jury pursuant to CALCRIM No. 443 as follows: "If the defendant forced another person to commit a crime by threatening, menacing, commanding, or coercing that person, then the defendant is guilty of the crime that the defendant forced the other person to commit."

*Jordan*, 2011 WL 1878809, at *5-6.

   The Court of Appeal ultimately denied Jordan relief, concluding that any error was

harmless beyond a reasonable doubt:

   Now [Jordan] claims that the version of CALCRIM No. 400 read to the jury was erroneous and misleading because it said that he was *equally guilty* of the murder whether he committed it personally, or aided and abetted the perpetrator.  According to [Jordan], under the instructions, once the jurors decided Glaude was guilty of second degree murder, they would automatically have to find him guilty of the same crime.  This result, he maintains, violated his due process rights.
. . . .

   It is the law in this state that an aider and abettor may be guilty of a greater homicide-related offense than the actual perpetrator, because there may be defenses or extenuating circumstances that are personal to the perpetrator that do not apply to the aider and abettor.  (*People v. McCoy* (2001) 25 Cal. 4th 1111, 1118-1122 (*McCoy* ).)  Of interest, the *McCoy* court discussed the notion that the mental state of an aider and abettor "'"floats free,"'" quoting Dressler, Understanding Criminal Law (2d ed. 1995) § 30.06[C], page 450, footnotes omitted:  "'[O]nce it is proved that "the principal has caused an *actus reus,* the liability of each of the secondary parties should be assessed according to his own *mens rea.*"  That is, although joint participants in a crime are tied to a "single and common *actus reus,*" "the individual *mentes reae* or levels of guilt of the joint participants are permitted to float free and are not tied to each other in any way.  If their *mentes reae* are different, their independent levels of guilt . . . will necessarily be different as well."'"  (*McCoy, supra,* at pp. 1118-1119.)

   *McCoy* has led to the conclusion that an aider and abettor may also be *less culpable* than the perpetrator if he or she had a less culpable mental state.  (*People v. Samaniego* (2009) 172 Cal. App. 4th 1148, 1164.)  As a result, and under the facts of the case, the court held that "CALCRIM No. 400's direction that '[a] person is *equally guilty* of the crime . . . whether he or she committed it personally or aided and abetted the perpetrator who committed it' [citation], while generally correct in all but the most exceptional circumstances, is misleading here and should have been modified."  (*People v. Samaniego, supra,* at p. 1165.)  Nonetheless, the reviewing court found the error harmless beyond a reasonable doubt because the jury necessarily resolved the issues against the defendants under other instructions.  (*Ibid.*)  Not so in *People v. Nero* (2010) 181 Cal. App. 4th 504, 519-520 (*Nero*), where the court concluded it was "clear that the jury was considering whether to impose a lesser degree or offense on the aider and abettor.  Notwithstanding that other instructions might have given them that option, there

is a reasonable possibility that the trial court's response to their questions[5] improperly foreclosed it."

> FN 5.  In *Nero*, the jury specifically asked whether it could find the codefendant, as an aider and abettor, guilty of a lesser offense than defendant Nero.  Rather than answering in the affirmative, the trial court twice reread the pertinent instruction which contained "equally guilty" language, and thus, the *Nero* court concluded it misinstructed the jury.  (*Id*. at pp. 510, 518.)

Assuming for purposes of resolution of this appeal that [Jordan] did not waive the issue and CALCRIM No. 400 *can be* misleading, we conclude beyond a reasonable doubt that it was not misleading in this case and even if it were, any error was harmless beyond a reasonable doubt.

We start with the basic principle that we determine the correctness of jury instructions from the entire charge of the court, not by considering parts of an instruction or a particular instruction.  (*People v. Smithey* (1999) 20 Cal. 4th 936, 963.)  The jury was first instructed on the various mental states for first and second[6] degree murder and voluntary manslaughter.  To prove that [Jordan] committed one of those crimes, the jury would have to find that he had the appropriate mental states.  The evidence showed that [Jordan] left his apartment to confront the people who had made lewd comments to Skaggs, notwithstanding that she downplayed the incident and said not to worry.  An altercation ensued.  Skaggs said three people jumped [Jordan]; others said they saw two men fighting.  There was no evidence that anyone was armed before [Jordan] or a woman yelled to get the assault rifle.  According to Skaggs, [Jordan] was on the ground with the rifle and Anderson, who looked disabled.  [Jordan] then threw Glaude the rifle and ordered him to kill Anderson.  Others said that one of the fighters ran inside and got the rifle; Jenkins reported that the fighter who retrieved the rifle shot Anderson execution style.  Certainly overwhelming evidence was present to satisfy the requisite mental state for second degree murder, namely that [Jordan] acted with malice aforethought, regardless of whether he was the perpetrator or aided and abetted the perpetrator.

> FN 6.  Pertinent to second degree murder, the court delivered appropriate instructions on malice aforethought and provocation.

The jury was also told that an aider and abettor of the crime must have knowledge of the perpetrator's unlawful purpose, combined with the specific intent of aiding, facilitating, promoting, encouraging or instigating commission of that crime.  Here the evidence revealed that the rifle that killed Anderson was [Jordan's] rifle.  He either yelled for the rifle to be brought to the scene, allowed it to be brought to the scene,[7] or got it himself.  The evidence further showed that [Jordan] specifically intended that Anderson be killed, either by instructing his brother to do it, or by killing Anderson himself.  Certainly the evidence overwhelmingly supported the requisite knowledge and intent for liability as an aider and abettor.

-14-

FN 7.   Jenkins is the only person who testified that a woman yelled to get the gun. Michael Woody apparently told the police a woman yelled for the gun, but he based that statement not on what he heard, but on what his sister told him.

The troubling word phrase here—"equally," as in the phrase "equally guilty"—appears amidst other proper instructions that directed the jury to its job of finding—or not finding—the correct mental state *for [Jordan]*. Moreover, the CALCRIM No. 400 instruction itself focused solely on "the person"—that is the defendant—and the crime that person committed, whether as a perpetrator or aider and abettor. We conclude that viewing the instructions as a whole and not in isolation, any error in failing to modify CALCRIM No. 400 was harmless under the standard announced in *Chapman v. California* (1967) 386 U.S. 18, 24.

[Jordan] of course draws our attention to his purported defenses, the question being whether there was evidence of any justification or excuse that lowered or eliminated his culpability for the homicide. The jury rejected [Jordan's] claims of self-defense, defense of others, imperfect self-defense and heat of passion. If the jury believed [Jordan] harbored a good faith belief that his life was in danger, the self-defense and defense of others instructions directed that the defendant *was not guilty of murder*. Under this scenario, whether [Jordan] shot Anderson or ordered Glaude to do the deed, *he would not have committed the crime of murder,* period.

Further, Glaude told the police that Anderson was "beating [Jordan's] ass on the ground"; he told Anderson to let [Jordan] go, and it was only then that [Jordan] gave the instruction to "finish" or "end" him.  (See pt. II.B., *post.*)  If the jury had believed [Jordan's] life was in danger or there was an honest but unreasonable belief of the same, it would not have found Glaude, as the perpetrator, guilty of second degree murder, and thus, under [Jordan's] view of the "equally guilty" instruction, he would not be "equally guilty" of that crime.

The jury also rejected any claim of heat of passion, and in any event defense counsel's argument was not heat of passion, but rather self-defense.  Moreover, the vague lewd comments made to and downplayed by [Jordan's] girlfriend were not of a magnitude to justify a heat of passion finding.

We finally underscore that the actions and statements of [Jordan] in the above recital of events transpiring after the shooting overwhelmingly show consciousness of guilt for the murder and were inconsistent with any defense or justification for the killing of Anderson.  Conversely, there was no evidence of any reflection or discussion to the effect that [Jordan] acted in self-defense or thought his life was in danger.  Thus, to reiterate, any instructional error was harmless beyond a reasonable doubt.

*Id*. at *6-8.

A challenged instruction violates the federal constitution if there is a "reasonable

likelihood that the jury has applied the challenged instruction in a way that prevents the

consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990).  It is well established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation."  Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process."  *See id.* at 156-57; *Estelle*, 502 U.S. at 72.

The Court of Appeal's conclusion that CALCRIM No. 400 did not mislead the jury was not unreasonable.  Although CALCRIM No. 400 does incorrectly state that "[a] person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it" because in California, an aider and abettor may be more or less culpable than the perpetrator, that instruction was not given in a vacuum.  CALCRIM No. 400 was a brief, introductory instruction generally setting forth how aiding and abetting liability applies.  The jury was then instructed correctly and thoroughly on the specific definition and elements of aiding and abetting.  The jury was additionally admonished that it needed to find not only that

Jordan committed the acts charged, but that he acted with the requisite mental state. Specifically, the jury was instructed pursuant to CALCRIM No. 401 that it could only convict Jordan of second degree murder on a theory of aiding and abetting if it found that he "kn[e]w of [Glaude's] unlawful purpose and . . . . specifically intend[ed] to, and d[id] in fact, aid, facilitate, promote, encourage, or instigate [Glaude's] commission of that crime." The jury was also instructed on the elements of first and second degree murder as well as the lesser included offense of voluntary manslaughter (based both on heat of passion and imperfect self-defense), and was admonished to consider the instructions as a whole. When CALCRIM No. 400 is considered with all the other instructions, even to the extent the instruction created a minor ambiguity, it is not reasonably likely that the jury applied the challenged instruction in a way that violates the Constitution. *Estelle*, 502 U.S. at 72; *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) ("[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.").

Finally, Jordan's contention that portions of the prosecutor's closing argument exacerbated the damage caused by CALCRIM No. 400 is also unpersuasive. The prosecutor repeatedly told the jury that, in order to convict Jordan of any of the charged crimes, it needed to find that he harbored the requisite mental state. The prosecutor specifically set forth the mental state required to find Jordan guilty as an aider and abettor:

> An "aider" or "abettor" is somebody who does three things. An aider and abettor has knowledge of the unlawful purpose that the perpetrator is going to commit. All right? He knows that the - - he has an idea, an understanding that the person who is going to commit the crime is going to do something unlawful. He then - - the aider and abettor forms the intent to help the perpetrator, to do something to help him out, to go along with the crime. All right? And, thirdly, by some act or advice he promotes or encourages the crime. So an aider and abettor knows that his other partner, the

perpetrator, is going to commit the crime.  He basically has the same intent to help commit the crime.  And then he actually does something to help it be committed.

The prosecutor then gave several hypotheticals in which an aider and abetter knew of a perpetrator's unlawful purpose, had the intent to assist in the crime, and did some act to further the crime.  In those instances, the prosecutor argued, the aider and abetter was just as guilty as the perpetrator.  Later, the prosecutor stated that if the jury believed Ware and sisters S1 and S2 that they saw Jordan shoot the victim, then Jordan was the perpetrator.  The prosecutor continued: "Either way, he's guilty of the murder, whether he's the shooter or whether he's the aider and abettor."  Jordan takes issue with the prosecutor's comments that he may be equally guilty as Glaude, but, in doing so, Jordan isolates one comment from the prosecutor.  Overall, the prosecutor argued that the jury could not rely on Glaude's mental state, but that it needed to determine Jordan's mental state as well.  And the prosecutor argued that, where the aider and abettor shared the same mental state as the perpetrator and the aider and abettor assisted in the commission of the crime, they were equally guilty.  The prosecutor's examples did not include extenuating circumstances which might cause an aider and abetter to be more or less culpable than the perpetrator, and as such, his comments about equal guilt were not necessarily incorrect. In light of all of the prosecutor's comments and the instructions as a whole, Jordan has failed to show that the instruction infected the entire trial such that his resulting conviction violated due process.  He therefore cannot prevail on his instructional error claim.

Admission of Glaude's statement to the police

Jordan next argues that the admission of Glaude's statement to police violated his right to confrontation and the failure of trial counsel to object to the admission of that unredacted

statement amounted to ineffective assistance.  The Court of Appeal summarized the facts of this

claim as follows:

> After Glaude advised the court that he intended to exercise his Fifth Amendment rights, the court specifically found he was unavailable to testify as a witness.  Defense counsel moved in limine to introduce the "admission/confession" of Glaude, as third party culpability evidence.  She argued that the identity of the shooter was a material issue of fact: The prosecution asserted it was [Jordan], which conflicted with Glaude's admission that he killed Anderson.
>
> Recapping an in-chambers discussion which occurred at the hearing, defense counsel stated that the court tentatively granted the motion, with the prosecutor indicating that if the statement were allowed, he wanted it played as part of the case-in-chief.  Defense counsel did not believe she had grounds to object and thus prepared a stipulation that *both* parties were offering the statement.  The court noted that it was the prosecutor's position that the statement should not be admitted.  The prosecutor explained: "I didn't think it was admissible, but I thought due process allowed it.  If the defense is going to put it in, then I should be able to put it in, so it didn't look like I was sand bagging the jury."
>
> The prosecutor also wanted to excise, as irrelevant, Glaude's statement that he "bought the dope from Rara,"[8] but the court would not strike it.  Defense counsel did not ask for any redactions.  Thereafter both counsel signed a stipulation agreeing that Glaude's videotaped statement was admissible, to be reviewed and considered by the jury.  However, they could not agree on a transcript of the interview and thus proposed playing the tape for the jury without any transcribed aid; the trial court approved this approach.  The prosecutor advised that he had redacted references to the fact that [Jordan] was on parole and on the run, and references to [Jordan] making or not making a statement to the police.  Defense counsel trusted that those portions were properly removed.

> FN 8.  "Rara" was the nickname of Anderson, the victim.
. . . .
> Glaude first told Detectives Pucci and Cheatham that he did not know what happened on November 4, 2007.  Ultimately Glaude opened up and stated that on that day, he was selling coke, and decided to do a couple lines himself.  He went to the movies with [Jordan], Wright and Skaggs, smoked some marijuana, and they all returned to the apartment on Shasta Street.  He bought six ecstasy pills "from Rah–Rah."  Skaggs went outside to get something and upon returning, reported to [Jordan] that one of Rah–Rah's friends, or maybe even Rah–Rah, said to her, "Keep clacking them heels." [Jordan] tried to have a "decent" conversation with Rah–Rah about not disrespecting his girl.  One of the men—"Pea"—kicked [Jordan] in the face; someone else grabbed his arm; and Rah–Rah snatched his chain.  Glaude just "popped another pill."  Glaude had never been in a fight or arrested; he was "scared to death because of all the drugs." [Jordan] called to Glaude; Glaude ran outside and saw two men holding [Jordan], another

hitting him. [Jordan] yelled, "Get the K" and the other two men ran to get their guns. Glaude went inside, got the gun, took off the safety[9] and ran down the stairs.  He said, "Nigger, you better let go of my brother," and when Rah–Rah did not, Glaude fired one shot.  He was not sure if he hit Rah–Rah, who was still fighting with [Jordan].  Rah–Rah ducked into the garage.  [Jordan] told Glaude to give him the gun and he did so. Rah–Rah was "beating [Jordan's] ass on the ground." [Jordan] and Rah–Rah scuffled; as [Jordan] was falling, he tossed Glaude the gun.  Rah–Rah was on top of [Jordan], "givin' it to him."  Glaude said, "Man, you gotta let go of my brother, I ain't gonna tell you no more." [Jordan] told him to "[f]inish him."  Glaude fired four more shots.

> FN 9.  Glaude said [Jordan] had recently shown him how to take off the safety.

> Glaude went inside, grabbed the computer, got in the car and put the rifle on the console.  People were shooting from a white Neon that followed them.  Glaude initially said he hung out the window and started shooting at the people following them.  When the detectives said they believed [Jordan] was shooting at the car, Glaude then claimed he threw Wright to the floor and got on top of her to protect her while they were being shot at.  He claimed he did not see his brother shoot out the window.

*Jordan*, 2011 WL 1878809, at *9.

The Court of Appeal first found that review of this claim was precluded by the invited

error rule:

> Although [Jordan] initially asserts that Glaude's statement was inadmissible hearsay and, due to its testimonial quality, was admitted in violation of his confrontation rights under *Crawford v.. Washington* (2004) 541 U.S. 36, he recognizes that trial counsel made a tactical decision to place the statement before the jury.  It was trial counsel who sought its admission, and drafted and signed a stipulation agreeing to its mutual admission.  [Jordan] cannot now be heard to assert hearsay or confrontation clause error. An affirmative tactical action taken by trial counsel and attacked as error on appeal is sufficient to invoke the invited error rule.  (*People v. Coffman and Marlowe* (2004) 34 Cal. 4th 1, 49.)  Invited error thus precludes review of these claims.

*Id*. at *10.

The Court of Appeal noted that Jordan's "true complaint" was that he was denied the

effective assistance of counsel because counsel did not move to exclude portions of Glaude's

statement that incriminated him—specifically, statements from Jordan telling Glaude to get the

gun and shoot the victim.  *Id*.  The court nonetheless denied Jordan relief on this claim:

[I]t is evident that counsel made an informed, tactical decision to introduce Glaude's statement as the best evidence to support [Jordan's] claim of self-defense. Skaggs testified that Anderson appeared disabled at the time of the shooting. On the other hand, Glaude claimed that after the first shot, Anderson went into the garage and came back, again "beating [Jordan's] ass on the ground." Anderson was on top of [Jordan]. It was at that point that [Jordan] told Glaude to finish Anderson. This testimony strengthened [Jordan's] claim of self-defense.

Moreover, the prosecutor and defense counsel could not agree on a transcript, apparently because parts of the tape were difficult to understand. Defense counsel argued that she believed Glaude said Anderson came out of the garage with a gun. She told the jury: "You may disagree with that. Mr. Ellis is going to tell you that he disagrees with that. . . . It's for you to decide, if that's what Marco Glaude said or not." Glaude's statement thus offered defense counsel a greater opportunity to argue self-defense.

[Jordan] is adamant that failure to urge redaction of "incriminat[ing]" statements against him rendered counsel ineffective, but he fails to appreciate that a party cannot pick and choose only favorable parts of an entire declaration or conversation. [California] Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party. . . ." The "incriminating" statements were nothing new; rather, they repeated other trial testimony. Hence counsel's informed tactical decision to enhance [Jordan's] self-defense claim by admitting Glaude's testimony was valid despite the fact that Glaude also said [Jordan] told him to get the gun and to finish Anderson. More to the point, the strategy was not to deny that [Jordan] was involved in the killing, but to show that it was justified on grounds of self-defense.

Counsel's performance did not fall below prevailing professional norms.

*Id.* at *10-11.

Respondent argues that Jordan's claim is procedurally barred because the Court of Appeal found his claim precluded by the invited error doctrine. Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). This Court may not reach the merits of procedurally defaulted claims, that is, claims "in which the petitioner failed to follow applicable state procedural rules in raising the claims." *Sawyer v. Whitley*, 505 U.S. 333, 338 (1992). The Ninth Circuit has recognized that where a state court applied the doctrine of invited error to bar a

claim, a federal habeas court may find the claim procedurally barred.  *See Leavitt v. Arave,* 383 F.3d 809, 832-33 (9th Cir. 2004) ("There is no reason that we should treat the invited error rule differently from other state procedural bars.").  However, because the resolution of the merits of this claim is comparatively straightforward on the current record, the Court will exercise its discretion to decide the claim on that basis.  *See Franklin v. Johnson,* 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same.").

The Court of Appeal did not unreasonably conclude that defense counsel made an informed, tactical decision to introduce Glaude's statement as the best evidence to support Jordan's claim of self-defense.  Glaude's statement corroborated the defense theories that Jordan was not the shooter and that Jordan was acting in self-defense because he had been attacked by Anderson, who possibly was brandishing a gun.  Glaude's statement was thus strong evidence of the contention that Jordan was acting in proportional self-defense when he directed Glaude to shoot Anderson.  Had the jury found this evidence credible, it could have acquitted him of murder.  Counsel was thus not deficient in introducing this evidence.

Jordan's claim that counsel was deficient in failing to redact from Glaude's statement any incriminating evidence of Jordan is equally without merit.  First, the statements which incriminated Jordan had already been testified to by other witnesses and accordingly admission of Glaude's statement was not prejudicial to Jordan.  Second, as the Court of Appeal noted, counsel would have been unsuccessful in moving to redact Glaude's statement because, under California Evidence Code 356, where part of a conversation is introduced into evidence by one

party, the other party may introduce it as a whole.  Counsel will not be deemed ineffective for

failing to make frivolous motions, and Jordan thus cannot prevail on this claim.  *See Sexton v.*

*Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) ("Counsel is not necessarily ineffective for failing

to raise even a nonfrivolous claim, so clearly we cannot hold counsel ineffective for failing to

raise a claim that is meritless." (internal citation omitted)); *see also Lockhart v. Fretwell*, 506

U.S. 364, 374 (1993) (O'Connor, J., concurring) (failing to raise a meritless objection cannot

constitute prejudice under a *Strickland* ineffective assistance of counsel claim).

<u>Admission of Dr. Gill as an expert, and counsel's alleged failure to hire a defense expert</u>

Before trial, the prosecution listed Dr. Gill, the forensic pathologist who performed the

autopsy on Anderson, as a prosecution witness to testify as to the victim's cause of death.  Both

the defense and the prosecution filed motions in limine concerning Dr. Gill.  Defense counsel

sought to cross-examine and impeach Dr. Gill with instances of disrepute from his work history,

including alleged incompetently-performed autopsies, extensive coaching by the prosecution, the

temporarily suspension of his medical license for drunken driving, several unsuccessful attempts

to pass his boards, as well as prior firings and demotions.  The prosecution, in contrast, sought to

exclude evidence relating to Dr. Gill's background.

At the May 5, 2009, hearing on the motions, defense counsel argued that she alternatively

would stipulate to the entire autopsy report and the court could accordingly exclude Dr. Gill as a

witness.  She argued, though, that if the court were to allow Dr. Gill to testify, she should be

permitted to vigorously cross-examine him.  The prosecutor argued that the cause of death and

the locations of the entrance and exit wounds were not at issue, so there was "nothing here to

cross-examine him on."  He argued that allowing defense counsel to cross-examine Dr. Gill

about his background would "eat up an incredible amount of time for a nonissue" and would be prejudicial to the prosecution, but stated that he would not stipulate to the cause of death and the entrance and exit of the bullet wounds.  The trial court ultimately ruled that defense counsel could cross-examine Dr. Gill as to his competency and instances of perjury, but that Dr. Gill's problems with alcohol, except as it related to his job performance, as well as the allegation that he had been extensively coached in an earlier, unrelated case, were not relevant.

At trial, Dr. Gill was offered as an expert on forensic pathology by the prosecution. During voir dire, defense counsel extensively questioned Dr. Gill about his work history, including instances where he had been fired, asked to resign, or demoted, the temporary suspension of his license due to alcoholism, as well disagreements over his autopsy findings. The trial court accepted him as an expert, stating that the testimony about his background "goes to the weight."

Jordan now argues that the trial court violated his rights to due process of law and a fair trial in denying defense counsel's motion in limine to exclude Dr. Gill as an expert based on Dr. Gill's alleged incompetency and that defense counsel was ineffective for failing to call an expert to counter Dr. Gill's testimony.  He raised this claim in his second *pro se* habeas petition to the superior court, which was denied on May 10, 2012.  He raised these identical claims in his subsequent petition to California Supreme Court, and that court summarily denied relief, citing to *Duvall*, 886 P.2d at 1258 (a petition needs to state with particularity the facts on which relief is sought) and *In re Swain*, 209 P.2d at 796 (same).

If a petition is dismissed for failure to state the facts with particularity—that is, with a cite to *Swain* or *Duvall*—the petitioner may file a new petition curing the defect.  *See Gaston v.*

*Palmer*, 417 F.3d 1030, 1037 (9th Cir. 2005); *Kim v. Villalobos*, 799 F.2d 1317, 1319 (9th Cir.

1986).  There is no reason the result should be any different when the defect in the state petition

is the failure to attach documentary evidence.  Neither the failure to attach documentary

evidence nor the failure to plead with particularity are irremediable errors.  It therefore appears

that the California courts would have allowed Jordan to file a new state petition remedying these

defects.  Accordingly, the *Duvall/Swain* bar did not cause these claims to be procedurally

defaulted in state court, and thus this bar does not cause them to be procedurally defaulted in

federal court either.  *See Cross v. Sisto*, 676 F.3d 1172, 1177 (9th Cir. 2012) (California state

court's denial of petitioner's habeas petition with citations to *Swain* and *Duvall* constituted

dismissal without prejudice and with leave to amend to plead required facts with particularity

and thus did not signify that petitioner's claims were procedurally barred as a matter of state

law).

      Jordan's claim that trial counsel was ineffective in failing to call an expert to counter Dr.

Gill's testimony is completely without merit.  The record reveals that defense counsel did in fact

obtain an expert pathologist.  Based on that pathologist's review of the evidence, defense counsel

offered, as an alternative to cross-examining Dr. Gill about his past, to stipulate to the entire

autopsy report, which included the cause of death and entrance and exit wounds.  Calling that

expert to corroborate Dr. Gill's findings would have been unnecessary and cumulative.

Moreover, defense counsel may have reasonably concluded that she could more effectively

challenge Dr. Gill through cross-examination without the rasing the concomitant risk of

exposing her own expert to potentially damaging cross-examination by the prosecutor.  *See*

*Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 791 (2011) ("*Strickland* does not enact

Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense."); *Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999) ("Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial.").  Finally, Jordan has failed to assert how a defense expert pathologist would have testified  and how the failure to call that expert prejudiced him.  *See Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1977) ("Speculation about what an expert could have said is not enough to establish prejudice.").

Jordan is also incorrect in asserting that the trial court denied defense counsel's motion in limine to exclude Dr. Gill as an incompetent witness.  According to the record, defense counsel did not object to Dr. Gill testifying or move to exclude him as a witness, but rather moved to cross-examine and impeach Dr. Gill with his checkered background.  In any event, the gist of Jordan's claim is that the trial court erred in "allowing an incompetent pathologist . . . to testify as an expert witness."

The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts."  *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).  The Supreme Court has further made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence.  *Estelle*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson*, 431 U.S. at 154; *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  A petitioner seeking habeas relief from an allegedly erroneous evidentiary ruling bears the burden of establishing that the evidentiary error deprived the

petitioner of due process because it was so pervasive that it denied the petitioner a fundamentally fair trial. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Jordan has not and cannot meet this standard because, as already discussed, defense counsel hired an independent pathologist to review Dr. Gill's findings, and that expert apparently agreed with Dr. Gill's findings because defense counsel offered to stipulate to the entire autopsy report. Thus, although Dr. Gill had a checkered past, his findings were corroborated by the defense expert and his testimony could not have rendered Jordan's trial unfair. In addition, Jordan essentially challenges Dr. Gill's credibility, and not the reliability of the methods he used. However, "it is the exclusive function of the jury to determine the credibility of the witnesses, resolve evidentiary conflicts and draw reasonable inferences from proven facts." *United States v. Brady*, 579 F.2d 1121, 1127 (9th Cir. 1978). Jordan thus cannot prevail on either his claim that defense counsel was ineffective for failing to hire an expert pathologist or that the trial court erred in allowing Dr. Gill to testify as an expert.

Jury tampering/impartial jury

On May 7, 2009, the trial judge noted for the record that he had "been informed by the bailiff that one or more jurors has been bothered by people who were in the courtroom last time." Alternate Juror B stated that several individuals were waiting for the jurors as they left the courtroom and shouted obscenities at the jurors. A man who had previously been thrown out of the courtroom shouted an unabbreviated version of "[y]ou better convict that Mfer." The court asked the bailiff to find that person and "to post a bailiff out there when the jury comes and goes."

Juror No. 2 then noted that there were about 15 individuals waiting for the jurors outside the courtroom, and those individuals pointed to him and said something as he walked to his car by himself.  The judge inquired about alternate arrangements for the jury's departure and arrival. The bailiff suggested that he could bring the jurors "in through the back door if they want to meet around where the judges park," and added that he could also "escort them out."  When the jurors expressed satisfaction with the arrangement to have a private entrance, Juror No. 3 wondered whether the private entrance was altogether too private.  That juror stated "if there's no court people around, and we're all just kind of gathered there, I don't know if it is going to make us a bit of a target."  After an unreported side bar with the attorneys, the judge came back on the record and told the jurors that he wanted "to be sure of something."  He asked if anyone in the jury box felt that "this unusual and improper conduct" would affect their ability "to be fair to both sides in this case."  The jurors replied that it would not.  The judge then announced that the jurors would be escorted through the back entrance.  The judge further told the jurors that if they could identify anyone who had shouted or pointed at them, the judge would "get them thrown out of this courthouse, which may help."  The judge additionally closed the courtroom to the public, except for the press, due to "misconduct" of "nonparticipant individuals."  Counsel for both parties stated that they had no objection.

On May 12, 2009, the judge informed the parties that he planned to reopen the courtroom to the public.  The judge stated that he would post additional bailiffs in the courtroom and that the jurors would continue to be escorted in and out of the courthouse through the back entrance. The judge further stated that he would warn the audience that anyone caught talking or attempting to communicate with the jury or defendant would be ejected.  Defense counsel urged

-28-

the judge to keep the courtroom closed to the public given that the threatening and disruptive behavior had continued.  Specifically, Ware had yelled "some words" at the defense investigator earlier that morning in the courthouse parking lot.  Defense counsel requested that the court inquire of the jurors if they could remain impartial if the court were to be reopened.

The court recalled the jury and, outside the presence of the public, asked if there was "[a]ny objection" to reopening the court if the court increased the presence of bailiffs and ejected disruptive members of the audience.  The jurors shook their heads, indicating that they did not object.  Defense counsel then specifically asked if any of the jurors would have an inability to remain impartial if the court were reopened.  The jurors unanimously stated that reopening the courtroom would not affect their ability to remain impartial.

Juror No. 7 then asked the judge if he would close the courtroom again "if something started happening outside the courtroom again."  The judge responded that he thought he would close the courtroom in the event the disruptive behavior continued because closing the courtroom "tends to drive everyone away," but that he would have to balance the defendant's right to a fair trial.  Juror No. 7 replied, "That is fine."

Jordan now argues that the jury "was tampered [with] and tainted."  He claims that the jury could not remain impartial and that the disruptive members of the audience scared the jury into finding him guilty.  Jordan raised this claim in his second *pro se* petition for habeas relief. When he raised these identical claims to the California Supreme Court, that court dismissed them with citations to *Duvall*, 886 P.2d at 1258 and *In re Swain*, 209 P.2d at 796.  Again, however, citations to those state law cases do not bar this Court from reviewing Jordan's claim.  *See Sisto*, 676 F.3d at 1177.

-29-

Extraneous influences on a jury can, under some circumstances, require the reversal of a conviction. *Parker v. Gladden,* 385 U.S. 363, 364-65 (1966). Indeed, "evidence developed against a defendant must come from the witness stand." *Fields v. Brown,* 503 F.3d 755, 779 (9th Cir. 2007); *see also Turner v. Louisiana,* 379 U.S. 466, 472 (1965) (holding that the requirement that the jury's verdict must be based on the evidence developed at trial "goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury"). Generally speaking, "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox v. United States,* 146 U.S. 140, 150 (1892). However, this does not mean that all extraneous information is *per se* prejudicial; certain extrinsic contact with witnesses, such as contact involved with "passing [jurors] in the hall," may ultimately be found to be *de minimis* and not prejudicial. *See Caliendo v. Warden of Cal. Men's Colony,* 365 F.3d 691, 696 (9th Cir. 2004) (citing *Gonzales v. Beto,* 405 U.S. 1052, 1058, 1055 (1972) (memorandum dissent and concurrence)). The presumption of prejudice that arises from such misconduct, although strong, is not conclusive; "the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Remmer v. United States*, 347 U.S. 227, 229 (1954) (applying *Mattox*); *see also Caliendo,* 365 F.3d at 696.

The misconduct Jordan is concerned with was harmless. The trial court conducted the hearing required by *Remmer* in the presence of both parties, discerned what had happened, received unanimous and unequivocal assurances from the jurors on two separate occasions that they could remain impartial, and took additional security measures to ensure that the misconduct

would not continue or jeopardize the jurors' safety. The trial court found the jury's assurances of impartiality believable by proceeding with trial. The court's implicit factual finding is presumed to be correct because "resolution [of a juror impartiality issue] depends heavily on the trial court's appraisal of witness credibility and demeanor." *Thompson v. Keohane*, 516 U.S. 99, 111 (1995); *Tinsley v. Borg*, 895 F.2d 520, 525 (9th Cir. 1990) (presumption of correctness applies to implicit findings). Moreover, counsel for both parties seemed satisfied with the jury's declarations of impartiality, as neither side objected nor took steps to remove jurors. Jordan's bare assertion that the jury could not remain impartial after the isolated instances of misconduct does not meet his burden of adducing clear and convincing evidence sufficient to overcome the presumption of correctness afforded the trial court's finding of impartiality. *See* 28 U.S.C. § 2254(e)(1). He therefore cannot prevail on his jury tampering claim.

<u>Perjury and prosecutorial misconduct in allowing perjury</u>

At trial, Dr. Gill testified about his autopsy findings. He testified that Anderson sustained five gunshot wounds. Two were fatal—one entered on the right side of his chest below the nipple, going through the lung, snapping a rib, and ending in the vertebrae, and the other entered the abdomen, traveling upward through the chest cavity and striking the lung and fracturing several ribs. A third wound through the middle back, which hit the spleen and kidney, would have been fatal without treatment. Two other wounds—one in the upper abdomen going through the body but not hitting any organs, and the other in the upper left buttock area shattering the hip—were not necessarily fatal. Dr. Gill thus concluded that Anderson died from multiple gunshot wounds.

Dr. Gill collected bullet fragments from Anderson's body and turned them over to the police technician who was present during the autopsy. Dr. Gill testified that the bullet wounds were all consistent with a medium caliber weapon, but he could not say whether the bullets were fired by one or more medium caliber weapons. As already discussed, defense counsel did not dispute these findings and offered to stipulate to the autopsy report.

Criminalist Gerald Smith examined the bullet fragments collected from Anderson's body and testified that a bullet core Dr. Gill recovered was not inconsistent with the 7.62-caliber rifle used in this case. Smith further testified that a bullet jacket recovered from the right side of Anderson's chest "had to have come" from Jordan's rifle. Other fragments recovered from Anderson's leg were not submitted to the laboratory for testing. Smith also analyzed four casings that were found at the site of the shooting and concluded that they were all shot from Jordan's 7.62-caliber rifle. Six other casings recovered from the scene were consistent with a 9-millimeter weapon and were all fired from the same firearm. Smith did not know what weapon they had been fired from because he was not provided with any comparison firearms.

Jordan argues that newly discovered evidence demonstrates that Dr. Gill perjured himself at trial and that the prosecutor committed misconduct in allowing Dr. Gill to testify falsely. The alleged newly discovered evidence consists of the following:

1) A letter from attorney John Steinberg enclosing a letter from the defense investigator, Eugene Borghello, as well as a news article. Steinberg stated that he could not raise any issues regarding Dr. Gill on direct appeal because the enclosed information was not part of the trial record, but that Jordan could include any such claims in his *pro se* habeas petitions.

2) A letter with a typed signature from Borghello stating that he believed that the Vallejo police improperly processed the crime scene.  Borghello also stated that the TV show "Frontline" was going to air a segment on forensic pathologists featuring Dr. Gill.  Borghello additionally mentioned that he recently ran into Krishna Adams, the prosecutor who handled Glaude's trial, who stated that she offered Glaude a seven-year plea deal "after learning that there were fragments removed from the victim that led her to believe that Anderson was shot by friendly fire, in addition to being shot by Glaude, inferring that Glaude had a self defense claim and that [Dr. Gill] botched the cause of death, or at least had things wrong."

3) An undated, unidentified document from an unidentified source which appears to be the text of a news article stating that Yolo County's Sheriff-Coroner's Office would be reviewing five homicide cases handled by Dr. Gill, who had "a history of errors," in order to ensure that his findings were accurate.  The document recounted much of Dr. Gill's background already known to the parties in this case.

4) An August 29, 2011, letter addressed to Jordan's trial counsel from the Solano County District Attorney's Office stating that "[m]ultiple recent media accounts . . . have documented Dr. Gill's employment history."  The letter stated that, in compliance with *Brady v. Maryland*, 373 U.S. 83 (1962), the District Attorney's Office was notifying defense counsel that Dr. Gill had been involved in Jordan's case, that it was sending defense counsel a CD containing unidentified discovery material concerning Dr. Gill, and that it would not oppose any request by defense counsel for a court order to release Dr. Gill's employment records.  This appears to be a standard form letter sent to all defense counsel who handled a case in which Dr. Gill had been involved.

-33-

In his first *pro se* petition for habeas relief, Jordan argued that this newly discovered evidence demonstrated that Dr. Gill committed perjury and that the prosecutor committed misconduct in presenting the false testimony.  The superior court, which issued the last reasoned decision on this claim, concluded as follows:

> [Jordan] fails to state a prima facie case for relief with regard to his newly discovered evidence.  (*People v. Duvall* (1995) 9 Cal. 4th 464, 475.)  [Jordan] includes an unverified letter signed by Mr. Borghello, which states that the prosecutor in Glaude's case told him that she offered Glaude a plea deal because she learned "that there were fragments removed from the victim that let her to believe that Anderson [the victim] was shot by friendly fire, in addition to being shot by Glaude, inferring that Glaude had a self defense claim and that Gil [sic] botched the cause of death, or at least had things wrong." However, this letter does not conclusively establish [Jordan's] innocence or reduced culpability.  (*In re Lawly* (2008) 42 Cal. 4th 1231, 1239; *In re Hall* (1981) 30 Cal. 3d 408, 423.)  [Jordan] has not shown or stated what evidence the prosecution relied on at trial, and he has not undermined that evidence.  (*Hall, supra*, 30 Cal. 3d at p. 417; *In re Clark* (1993) 5 Cal. 4th 750, 766.)
>
> Moreover, [Jordan] fails to state a prima facie case for relief with regard to his prosecutorial misconduct claims.  (*Duvall, supra*, 9 Cal. 4th at p. 475.)  [Jordan] sets forth no facts or evidence to support that the prosecutor in his case committed any prejudicial misconduct.  (*Id*. at p. 474.)

"[T]he [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnotes omitted).  The essential elements of prosecutorial misconduct are that (1) the testimony is false or perjured, (2) the prosecutor knew that the testimony was false or perjured, and (3) the false testimony was material.  *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc); *see Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th Cir. 2001).

An independent review of the record establishes that Jordan's claim that Dr. Gill committed perjury and that the prosecutor committed misconduct in allowing Dr. Gill to testify

falsely is without merit.  Although the prosecutor has a duty to refrain from knowingly

presenting perjured testimony, *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002), the

record in this case does not establish that the prosecutor knew or should have known that Dr.

Gill's testimony was false or that his testimony was, in fact, false.  Jordan's supplementary

documents also provide no factual basis that would lead this Court to conclude that Dr. Gill

testified falsely or that the prosecutor knowingly presented false testimony.  *See Morales v.*

*Woodford*, 388 F.3d 1159, 1179 (9th Cir. 2004).  Borghello's letter is not a sworn statement, and

his comment that Adams believed some of the fragments were caused by friendly fire is

inadmissible hearsay.  Moreover, Adams' belief that some of the bullet fragments were caused

by friendly fire was not inconsistent with Dr. Gill's testimony.  Dr. Gill only examined the bullet

wounds and did not test the fragments themselves.  According to Dr. Gill, the bullet wounds

were all consistent with one another and consistent with a medium caliber weapon, but he

acknowledged that he could not testify as to whether they came from the same weapon.  It is

possible some fragments recovered from Anderson's body were from friendly fire—after all, the

criminologist testified that not all fragments collected from Anderson's body had been submitted

for testing, and bullet jackets from a 9-millimeter weapon were found at the scene—but again,

Dr. Gill had no involvement in the testing of these fragments.  In sum, there is no evidence that

Dr. Gill fabricated his autopsy report, which was apparently uncontested by the expert hired by

defense counsel, or perjured himself at trial.  Jordan's assertions to the contrary provide no basis

for habeas relief on the ground of perjury or prosecutorial misconduct.

## V. CONCLUSION AND ORDER

Jordan is not entitled to relief on any ground raised in his Amended Petition.

**IT IS THEREFORE ORDERED THAT** the Amended Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: November 25, 2014.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge